UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

MODAVOX, INC.,

   Plaintiff-Counterclaim Defendant,

 -against-              07 Civ. 7088 (CM)

TACODA, INC.,

   Defendant-Counterclaim Plaintiff

_____x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/25/09

MARKMAN CLAIM CONSTRUCTION RULINGS
AND SCHEDULING ORDER FOR THE SUBMISSION
OF EXTRINSIC EVIDENCE ON CERTAIN TERMS

McMahon, J.:

   For the Court's rulings on claim construction following a Markman hearing limited to intrinsic evidence:

**The Patents in Suit**

   There are two patents at issue in this infringement action. The first is Pat. No. 6,549,691 (the '691 patent) which was filed on October 28, 1999 and issued on July 15, 2003. The second is Pat. No. 7,269,636 (the '636 patent), which was filed on July 1, 2003 and issued on September 11, 2007. The '636 patent is a continuation of the '691 patent, so the terminology is identical in both patents. Unless otherwise indicated, all column and line references in this opinion are to the '636 patent.

   The invention disclosed in the patents is entitled "Method and Code Module for Adding Function to a Web Page." As I understand it, the purpose of the invention is to allow a party who creates a web page to add some "function" to that web page when it is downloaded by an end user. The parties do not agree on the meaning of the term "function," which is critical to the ultimate resolution of this case.

   The Background of the Invention in both patents (see, e.g., '636 Patent at col. 1-2) reveals that the critical import of downloading additional functionalities is to permit advertisers to display their wares to computer users who access the Internet – or, put more colloquially, to show "commercials" over the Internet – in an economical and effective way.

As a general matter, the invention disclosed in these two patents is as follows: when a Web page is downloaded from the Internet by an end user who is sitting at his personal computer (a "processor platform"), it already has "embedded" into its architecture a first "code module" (i.e., computer program), which "executes" automatically upon downloading. The first code module issues two commands: one directing the end user's computer to "retrieve" a "second code module" from a server system, and another directing the second code module to execute after it is downloaded. When the second code module executes, it causes the added "functionality" to be displayed on the web page. There also appear to be aspects of the claimed invention that are directed toward targeting the added functionality to the needs and/or interests of the end user.

The only task at this stage of the proceedings is to construe any claim terms on whose definition the parties cannot agree. Whether the patent, properly construed, is a valid patent, and if so whether defendant is infringing that patent, are questions left for another day.

The parties originally identified five claim terms that required construction. In accordance with this Court's rules, they briefed the issue of claim construction, relying exclusively on intrinsic evidence.[1] After the court reviewed the parties' submissions, we held a full afternoon's oral argument, at which the disputes between them were more fully refined. Since it appeared to the court that there might be one or two additional terms on whose definitions the parties did not agree, I ordered that they have another "meet and confer" session, and then either provide the court with an agreed-upon definition of those terms (of which the most important was "function/functionality") or offer their individual interpretations for the court's review. I have subsequently received letter briefs in which the parties offer competing proposed definitions of the key "function/functionality" term.

The court is now ready to construe the claims, to the extent they can be construed without recourse to extrinsic evidence. All five of the claim terms that were the subject of the hearing can be finally construed based on intrinsic evidence alone; the court will require extrinsic evidence to construe the term "function."

*Disputed Claim Term 1: Function/Functionality*

Plaintiff defines a "function" as "any kind of information that can be retrieved from somewhere else on the WorldWideWeb and incorporated into a Web page." Its definition of "to add function to a web page" is "To permit or enable the efficient targeting of content, tailored to specific end users, to be displayed on a Web page."

Defendant defines a "function" as "streaming media or other media services," and defines "to add function to a web page" as "to add streaming media or other media

---

[1] To the extent that either party has gone beyond strictly intrinsic evidence – for example, plaintiff cites the court to a number of dictionary definitions -- the court takes no notice of that evidence/those arguments.

services tailored (or customized) to be compatible with a Web page." (Tacoda Presentation at 4, "Modavox Patents at Issue").

In addition to the obvious difference between the parties' definitions, there is a second difference: while both sides agree that the "function" must be "tailored" (or customized), Modavox claims that the "function" is tailored to the end user, while Tacoda contends that the "function" is tailored to be compatible with a particular web page. (This feeds into Tacoda's proposed definition of the disputed term "service response," about which more below).

Plaintiff's proposed definition of "function" is far too broad, as it literally incorporates all the information ("content") in the world. Furthermore, "function" as used in the patent is a noun, while "targeting" (as in the phrase "the targeting of content") is a participle that conveys the "action" elements of a verb. As used in the patent, a "function" is a *thing*, not an action or process; it is some additional feature that is deemed desirable "for the purpose of enhancing the appeal of the site" (2:1-2), such as "an 'affiliate' program." (1:66) Therefore, "function" (the thing that is added) cannot be defined as "the targeting of content" (an action).

However, defendant's proposed definition is too narrow.

The preferred embodiment discusses the addition of media-related functions to a web page (the example used is "Surfnet Radio," Item 11 in Figure 4). This is hardly surprising, since Modavox is a radio company. At our first Markman hearing, when it became clear that the parties really did not agree on the definition of "function," Tacoda urged that the term was circumscribed by the preferred embodiment to mean "streaming media." It cited a recent Federal Circuit case in which that court ruled that where no language in the specification indicates an intention to disclose an alternative embodiment, the specification must be construed as limited to the preferred embodiment. Netcraft Corp. v. eBay, Inc., 549 F. 3d 1394, 1399 (Fed. Cir. 2008).

But in Netcraft, the court noted that no language in the patent suggested the existence of any embodiment other than the preferred embodiment. That is not true in our case. Indeed, it appears from the face of the patents that the proposed invention was not intended to be limited to streaming media. In the Section entitled "Detailed Description of Preferred Embodiments," Modavox expressly disclaims any intention to so limit its invention. For example, at 14:39-48, it states:

> Although the preferred embodiments of the invention have
> been illustrated and described in detail, it will be readily apparent
> to those skilled in the art that various modifications may be made
> therein without departing from the spirit of the invention or from the
> scope of the appended claims. The specification and drawings are,
> accordingly, to be regarded in an illustrative rather than restrictive
> sense. Furthermore, although the present invention is described in
> connectio with a media appliance metaphor for providing streaming

> audio, this is not intended to be limiting.

This does not appear to be a case that falls within the scope of the Netcraft decision; in Netcraft, the patent specification apparently contained no such language.

Since the hearing, defendant has somewhat modified its original position. Now Tacoda would limit the definition of "function" to streaming media *or other media services*. No doubt defendant is relying on the very next sentence in the patent, which says:

> For example, the metaphor may providing [sic] streaming video and other multimedia communication formats.

Again, Tacoda relies on Netcraft. However, even this use of the Netcraft opinion is problematic, since elsewhere in the specification, the patentee took pains to insert an even broader non-limiting disclaimers:

> Although the present invention is described in connection with the presentation of media appliance metaphor 111 as applied to Web page 34, it need not be limited to such a media appliance metaphor. Rather, first code module 36 (FIG. 2) can be embedded in a Web page to be executed by a visiting processor platform in order to execute other code modules not associated with media appliance metaphors.

(6:3-9). Modavox insisted that "metaphors" (software devices that exist in the realm of electronic communication and have some counterpart in the real world, see 5:47-49) could "take any form desired for which practical programming constraints can be met" (5:61-62), including but not limited to "interactive video games, network games, network information appliances such as web based telephones or call centers, and notification services appliances, like beepers." (5:62-66).

It thus appears to the court that Tacoda is misapplying Netcraft in this instance and is attempting to limit the invention in ways that the patentee specifically declined to limit it.

The unfortunate result of concluding that one party's proposed definition of "function" is overbroad and the other's is overly narrow is that the court is left without any guidance about how a person skilled in the art would understand the term. It thus becomes necessary to resort to extrinsic evidence.

As noted above, each party attempts to add a further restriction to the phrase "to add functionality to a web page," by inserting some limitation relating to the "targeting" or "tailoring" of something. Modavox – which tried unsuccessfully to define "function" in terms of targeting – asserts that the content of the as-yet undefined "function" must be

tailored to a specific end user. Tacoda urges that any "tailoring" of the "function" is to make it "compatible" with some Web page.

Both parties' efforts appear to be misguided, because the phrase "to add function to a web page" does not seem to have anything to do with targeting or tailoring. At least as to defendant, that is apparent when one reads Tacoda's proposed definition of another disputed term – "service response" – and sees how the effort to wedge the concept of tailoring or targeting into the definition of "function" relates to its argument about how to define "service response." Absent testimony from a person learned in the art to the effect that "targeting" or "tailoring" is a usual and customary aspect of a "function," this court is not inclined to shoehorn an unrelated concept into the definition of the disputed term.

*Disputed Claim Term 2: First Code Module Embedded [ as in a web page]*

The parties agree that a "code module" is a bundle of code that a computer can read – or, more simply, a computer program. And in the context of this patent, where two separate code modules are needed for the invention to function, the "first" code module is the first of the two computer programs to download onto the end user's platform (computer) and to "execute" – that is, to run, or to carry out its programming instructions.

Where the parties disagree is over the meaning of the word "embedded." I conclude that Tacoda has the upper hand in this argument.

There are times when "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Phillips v. AWH Corporation, 415 F. 3d 1303, 1314 (Fed. Cir. 2005), *citing* Brown v. 3M, 265 F. 3d 1349, 1354 (Fed. Cir. 2001). Such is the case with the word "embedded." One need not refer to a dictionary to know the common meaning of that common English word: something is "embedded" in something else when it is planted inside, and so is physically contained within, that something else. Neither party suggests that "embedded" is some sort of technical term. Therefore, the word's plain meaning should control.

Tacoda adopts that plain English meaning of the word "embedded" when it defines "first code module embedded" as "a computer-readable program that is contained within the HTML code of a web page." (HTML – HyperText Markup Language – is the predominant markup language for Web pages on the World Wide Web)

Modavox urges that "embedded" refers either to a code module that is physically planted and contained within the web page or to a code module that, while not physically present, is referenced in the web page for future insertion.

I reject Modavox's effort to broaden the scope of the language it used in its patents. Computer code is not "embedded" within a web page when it is merely referenced for future insertion into the web page. Rather, an embedded code is a code

that has already been placed into the architecture of the web page. Every principle of claim construction supports such an interpretation.

1. Tacoda's interpretation conforms to the ordinary meaning of the word "embedded," Phillips, *supra*, 415 F. 3d at 1321 (Fed. Cir. 2005).

2. It also makes sense in the immediate context of the claim term. It is axiomatic that the immediate context is highly instructive to a person skilled in the art in construing the claim term. Phillips, *supra.*, 415 F. 3d at 1312. Therefore, one must look closely at how the word is used in its context. While "embedded" functions as an adjective in the patents (i.e., it *describes* the first code module), that adjective derives from a verb that is in the past tense, thereby suggesting that the act of embedding the code module has already occurred. Eastman Kodak Co. v. Goodyear Tire & Rubber Co., 114 F. 3d 1547, 1553 (Fed. Cir. 1997). This becomes clearer clear when one reads the entire clause in which the word "embedded" appears; its says: "When said Web page is downloaded, automatically executing a first code module embedded in said Web page." Nothing in that language suggests that the first code module could be referenced in some link that is embedded in the Web page, called up and then incorporated into the already-downloaded Web page. It is the code module itself, not a link to the code module, that must be embedded, so that it can execute AUTOMATICALLY (i.e., without any further action by anyone) when the Web page is downloaded. Modavox's suggested reading of the language would read the "embedded" out of the patent. Chef. Am. Inc., v. Lamb-Weston, Inc., 358 F. 3d 1371, 1374 (Fed. Cir. 2004) READ.

3. Tacoda's proposed meaning conforms to the specification. The specification is the best source of the meaning of a disputed term, and provides the primary basis for construing the claim. Phillips, supra., 415 F. 3d at 1315-17. Here, the specification contains a Figure that shows the first code module as entirely contained within the architecture of the web page (Fig. 1, Items 34, 36). Furthermore, the language of the specification reveals that the first code module is "embedded in the HTML of the web page *when a Web page developer designs the Web page* (Emphasis added) and "may be copies and pasted into a web page during Web page development" (5:3-5). Modavox has not cited, and the court has not located, anything in the patent that discloses any other concept of embeddedness, or suggests that the code can be "embedded" by being linked into the Web page well after the page has been designed by its developer. In a case decided only two months ago, the Federal Circuit ruled that where nothing in the specification suggested any that any alternative embodiment fell within the scope of the claim, construction of a claim term should be limited by what was disclosed in the specification. Netcraft Corp. v. eBay, Inc., 549 F. 3d 1394, 1399 (Fed. Cir. 2008).

Modavox's rejoinder to Tacoda's argument is that "embedded" need not mean "entirely contained within" because such an interpretation would violate the doctrine of claim differentiation. This doctrine stems from the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope. Seachange Int'l, Inc. v. C-COR, Inc., 413 F. 3d 1361, 1368 (Fed. Cir. 2005). The presumption is, however, rebuttable, and can be overcome by a

contrary construction dictated by the written description [contained in the specification] or prosecution history." Id. at 1369. While two claims of a patent are presumptively of different scope, the doctrine of claim differentiation cannot broaden claims beyond their permissible scope, or supplant other canons of construction that compel a narrower construction. Tate Access Floors, Inc., v. Maxcess Technologies, Inc., 222 F. 3d 958, 967-68 (Fed. Cir. 2000); Bristol-Myers Squibb Co., v. Ben Venue Labs., Inc., 246 F. 3d 13678, 1376 (Fed. Cir. 2001).

Modavox argues that Dependent Claim 2 in the '636 patent would be redundant of Independent Claim 1 if the meaning of "embedded" were limited in the way suggested by Tacoda. To be precise, it notes that this dependent claim describes a method where the first code module "issues said first command" to retrieve a second code module "from a server via the network connection. (15.1-3). Plaintiff argues that this demonstrates that the embedded code module claimed in Independent Claim 1 "can issue a command that retrieves a code module from a server system using the Internet." (Modavox's Opening Claim Construction Brief at 8)

However, as Tacoda points out in its responsive brief, Independent Claim 1 of the '636 patent, which recites that the first code module "issues a first command to retrieve a second code module," is silent about where that second code module might be found. Dependent Claim 2 of the same patent specifies that the second code module be retrieved "from a server system via a network connection." The reference to the server system and the internet adds a new and different requirement that is not found in Independent Claim 1, where the word "embedded" appears. Thus, there is no risk of redundancy between the two claims if the word "embedded" is given its common sense meaning. That, as the Federal Circuit has recently instructed, renders the doctrine of claim differentiation inapplicable. Netcraft, *supra.*, 549 F. 3d at 1400.

Finally, Modavox's contention that the first code module would be "embedded" if it included code referenced or loaded via a link in the Web page also renders the claim language ambiguous. Tacoda offers an excellent example. If the first code module consisted of a reference to a link to the second code module, then the second code module would be part of the first code module. That, of course, would render it superfluous to "retrieve" the second code module – because the second code module would already be "embedded" in the web page by virtue of its being referenced via link to the first code module! Such a construction is nonsensical.

Accordingly, I accept Tacoda's interpretation of the word "embedded" and I will define for the jury the phrase "Web page including a first code module embedded therein" as follows:

> "Embedded means contained within the programming architecture (technically known as its "HTML code") of a computer-readable program (the technical name for which is "code module").

*Disputed Claim Term 3: Command*

By the end of the oral argument it appeared that the parties no longer disagreed about the meaning of the word "command" as it is used in the patents in suit. Both sides agree that a "command" (used as a noun in the patents) means an order, instruction or direction (as in the phrase "issues a command," which plainly means "gives an order, instruction or direction.") Indeed, as used in the patents in suit, the word "command" is self-defining and requires no particular explanation. Tacoda would have me modify the words "order, instruction or direction" with the word "program" (as in "a program order, instruction or direction"); but since the command issues (emanates from, is given by) a computer program (the first code module), the proposed modifier would be superfluous. Therefore, I will define "command" as:

A command is an order, instruction or direction.

*Disputed Claim Term 4: First Code Module Issues a First Command to Retrieve a Second Code Module*

The plain meaning of this phrase is that the first code module (described above) issues (gives) a command (an order, instruction or direction) that a second code module (a different computer program) be retrieved (fetched from some other location – that is, the second code module, unlike the first code module, is NOT already embedded in the Web page). This definition appears to describe quite accurately what happens during the patented process; it conforms to the specification in every particular. Indeed, the term appears to be self-defining.

Tacoda's proposed definition of the disputed claim term as follows: "The first code module performs a program instruction contained within the first code module to request the downloading of a second code module from a location on a network." This appears at first blush to be a more convoluted way of articulating the plain meaning of the phrase – although there is a twist.

Modavox, on the other hand, clearly seeks to expand the scope of its patent by defining this term as follows: "An instruction by a code module that initiates the transfer or retrieval of another code module." While not quite grammatically accurate ("an instruction" is a noun; the term to be defined is not a noun), it, too, seems to capture the general idea of the claim – although it uses the term "retrieval" in the definition of "retrieve."

The only meaningful difference between these two definitions is whether the first command that is issued by the first code module – the command to retrieve the second code module -- can be located somewhere other than within the first code module. Tacoda says the command, "Fetch the second code module" must be located (i.e., programmed) within the first code module itself. Modavox insists that the process of retrieving the second code module could encompass multiple steps, with the ultimate "Fetch" command being located somewhere outside the first code module. For example,

the first code module could be programmed to link up to a remote server or a linked web page where the command, "Fetch the second code module" was embedded and (presumably) direct that remote or linked server or page to send out that command, thereby causing the second code module to be retrieved.

The asserted claims themselves do not expressly indicate whether the command that issues from the first code module must be located within that code module or whether the first code module can be programmed to call on a command located elsewhere. However, the specification discloses a preferred embodiment in which the command is contained within the first code module. Modavox argues that Tacoda is attempting impermissibly to limit the scope of its patent to the preferred embodiment; while Tacoda, citing the recent Netscape opinion, argues that nothing in the patent (including the specification) discloses the possibility of any other embodiment -- which augurs for a narrow construction.

In this instance, I agree with Tacoda.

In the context of this invention, the first code module is a computer program that does two things – issues a command to fetch the second code module and then directs the second code module to execute. Furthermore, the first code module must issue the command to fetch the second code module "automatically" (i.e., without any intervention). The first code module must, therefore, be programmed (i.e., contain the instruction) to issue the "Fetch" command.

There are several obvious flaws in Modavox's definition. First, it is quite clear that, for the purposes of this invention, only one code module – the one that is embedded in the Web page (i.e., the FIRST code module) – can issue the command to retrieve the second code module. Modavox impermissibily broadens the scope of its claim in its definition by not  specifying that the instruction to retrieve the second code module must issue from the first code module; instead, it uses the formulation "a" code module, which could be any code module (computer program), not just the first code module.

A second flaw is that Modavox adds the word "transfer" to the definition, which introduces an unnecessary complication. The claim language speaks only of "retrieving" the second code module – not of transferring it. Transfer and retrieval are not the same thing, so adding the word "transfer" to the definition does not make the word "retrieve" any clearer. Nor does "retrieve" require any clarification: in the context of this patent, the specification discloses that the second code module is "assembled" in response to the issuance of the "retrieve" command by the first code module.

Tacoda inserts the concept of downloading into the definition of this claim term. However, it is not wrong to do so. The second code module must end up on the client computer (the one that displays the Web page)(2:61-65) – that is the purpose of "retrieving" it. A person skilled in the art would recognize that a computer program retrieved from a remote server ends up on a client computer via the process known as "downloading." 999

I therefore adopt Tacoda's proposed definition of this term and will instruct the jury that "first code module issues a command to retrieve a second code module" means:

> The first code module performs a program instruction contained within the first code module to request the downloading of a second code module from a location on a network.

*Disputed Claim Term 5: Service Response*

A significant portion of the oral argument was consumed with the dispute over the meaning of the term "service response." Tacoda proposes that it be construed as follows: "Information stored in association with the Web address of the downloaded Web page that controls user access to additional Web page functionality." Modavox offers a much more general definition: "A response to a query, including a reply or non-reply."

It behooves me to place the phrase in context.

The first thing that happens after the first code module issues the first command to retrieve the second code module is that the a second code module "having a service response" is "assembled" in response to "said issuing operation." The first code module then issues a second command, which initiates execution of the second code module at the end user's computer (the processor platform) in response to the request. ('636 patent Claim 1). So the service response is something that is assembled (built/programmed) into the second code module.

Modavox's proposed definition is quite broad; literally any answer to any type of question would fall within the term "service response." Tacoda's proposal is narrower. It contends that the service response is information, stored in connection with the downloaded Web page (i.e., the one that contains the first code module embedded therein), that "controls user access" to some additional functionality (such as streaming media, as in the preferred embodiment). Tacoda adopts this definition because, in its view, the specification discloses only three possible service responses -- predetermined service (which is, for Tacoda, the default mode), denial of service, or customized (conditional) service. Whatever the "service" is, the "response," as far as Tacoda is concerned, is either, 'You can access the service," "You can't access the service" or "You can access a customized form of the service." The "service," it seems, is whatever functionality is supposed to be added to the Web page.

The problem with Tacoda's proposed definition is that is conforms exactly to a dependent claim in the patent, which means that the principle of claim differentiation would be violated if the term were so defined.Dependent Claim 8 of the '636 patent discloses, "A method as claimed in claim 1 wherein said service response is one of a denial of service indication, a conditional service indication, and a predetermined service." Under the doctrine of claim differentiation, discussed above, one presumes that Dependent Claim 8 adds some new and different requirement that is not present in the

independent claim (Claim 1) from which it derives. The only new requirement that is apparent from the language of the claim limits the service response to one of the three responses claimed in Dependent Claim 8. Thus, the term "service response," which appears in Claim 1, must not be limited to the three possible responses set forth in Claim 8 – which is to say, it must be possible for a "service response" to me something other than one of the three answers specified in Claim 8.

Similarly, Dependent Claim 11(as well as Independent Claim 17) identifies the "service response" as "a metaphor," which the parties advise (and the specification confirms, see 5:47-53) is a software device that exists in the realm of electronic communication and has a counterpart in the real world – for example, a graphic (visual) representation of something that looks and behaves like its real world counterpart. In the specification, the patentee uses the example of a representation of a radio image, which, when mouse-clicked by an end user, "turns on" to connect the end user with a music channel. So while not all "service responses" are "metaphors," some service responses may be (indeed, pursuant to Claim 17, will be). This accords with the preferred embodiment disclosed in the specification, which uses metaphors to indicate whether service is accepted or denied.

In light of the above, the court concludes that the service response referred to is indeed, the "reply to a query" (the answer to a question), as Modavox contends – but it is not the answer to any and every question. Rather, as used in these patents, it is the answer to a very specific question: "Will you, the end user, accept this service and on what terms?" The answer need not be limited to "yes" or "no" and it need not be displayed in the form of a metaphor. But it must be an answer to that singular question.

This definition is in keeping with the specification's disclosure that the invention is "able to tailor the added function based on information about the Web page in which [the first code module] is embedded *and based on visitor specified preference*." (14:35-38)(Emphasis added). At oral argument, Tacoda suggested that "visitor specified preferences" would include pop-up blockers, cookie blockers and parental controls – features that render a particular web site compatible with the end user's preferences. In defendant's view, the "service response" determines whether an end user will have access to the additional Web page functionality that is added as a result of the plaintiff's invention. I agree that all of the disclosures of the patent support such a view of what the "service response" might be. Additionally, defining "service response" as the answer to the question, "Will you accept this service and on what terms?" accords with the natural meaning of the words "service" (something that is provided) and "response" (answer or reply).

Defendant insists that its definition is the only possible definition in view of the prosecution history. Among the prior art cited by the Patent Examiner in his Office Action rejecting the '791 application as "obvious" was the Fields patent. The Examiner drew a parallel between the "service response" claimed by Modavox and an aspect of Field called the "filter definition." In a January 2003 Amendment filed to the '791

application, Modavox explained the difference between the "service response" and the "filter definition" as follows:

> [Certain] passages from Fields [were]cited in the Office Action.....Although the correlation is unclear, Applicants presume that the Examiner is drawing a parallel between the claimed service response and the Fields filter definition. Applicatns describe *the claimed service response* on page 14, lines 17-26 as being a media appliance metaphor, a media appliance metaphor with a slash through it, or the absence of any media appliance metaphor. Moreover, as recited in amended claim 6, the service response is included in the second code module. The Fields filter definition is not a service response included in the second code module, as recited in amended claim 6. Rather, the Fields filter definition is used to modify the content of an existing Web document. (Emphasis added)

Tacoda argues that this response to the Examiner effectively disclaims any other meaning for the term "service response" than one of the three media appliance metaphors described in the preferred embodiment.

Modavox's use of the words "the *claimed* services response" (highlighted in the paragraph quoted above) could be read as indicating that it intends to limit what it is claiming in that manner. However, 1 do not so read it. Rather, Modavox is specifying what is claimed at a particular point in the specification; it them distinguishes Fields on the basis that the feature of Fields considered analogous to the service response by the Examiner – the filter definition – is not included in the second code module.

The citation to the patent application in the above-quoted passage refers to language found in the '636 patent at 7:42-60. That language plainly and unmistakably supports the court's conclusion. It clearly discusses "service response" in terms of whether the end user's processor will accept or reject the "service" offered – the "service" being the Web page with added function. Whether the answer to that question t takes the form of a metaphor (with or without a slash) appears irrelevant to the meaning of the term.

I thus conclude that the answer to the question, "Will you accept service and on what terms?" is not limited to Claim 8's "Yes, yes with explanation and no" – and is certainly not limited to metaphor form – in all instances. Such a conclusion accords with the doctrine of claim differentiation.

Therefore, the court will define the term "service response" as follows:

> The service response is the answer to the question, "Will you the end user accept (display) the web page containing added

function, and on what terms will you accept it?"

*Disputed Claim Term 6: "Assembling Said Second Code Module Having Said Service Response" (and similar variations).*

Modavox defines this phrase as "manipulating computer code instructions that include a service response." Tacoda's counter-definition is "creating at the server, a customized, executable computer program that controls user access to additional Web page functionality."

Frankly, there is very little difference between these two definitions. Where Modavox uses the words "service response," Tacoda inserts a variant of the definition of that term selected by the court. And while Tacoda includes a great deal of additional and (or so it appears) unnecessary "stuff" in its proposed definition of the term "assembling," Modavox's "manipulating computer code" is unnecessarily broad. The word "assemble" has a commonly understood meaning – "put together" – that can be used to create the following definition:

> The term "Assembling Said Second Code Module Having Said Service Response" means putting together a second code module (which, as you already know, is a computer program) that includes, as part of the program, a service response (which I have previously defined for you).

### Scheduling Order

The parties are directed to provide the court with extrinsic evidence to support a construction of the term "function" that is not precluded by the intrinsice evidence. The parties have thirty days to offer the court any extrinsic evidence that would support a proposed definition, including expert testimony; they shall provide their evidence simultaneously. It will not be necessary to put in reply papers. After I have had an opportunity to digest the parties' submissions, I will schedule a further hearing.

The period for submitting infringement contentions, which I believe was to commence with the issuance of this decision, will begin to run when I issue the Markman decision construing "function."

Dated: March 24, 2009

*(signature)*
U.S.D.J.

BY ECF TO ALL COUNSEL